UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RONALD KRIEGER, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| | § | Civil Action No. 4:15-cv-2017 |
| Plaintiff, | § § | JURY TRIAL DEMAND |
| v. | § § | |
| LRR ENERGY, L.P., LRE GP, LLC, ERIC D. MULLINS, CHARLES W. ADCOCK, JONATHAN P. CARROLL, JONATHAN C. FARBER, TOWNES G. PRESSLER, JR., JOHN A. BAILEY, LIME ROCK MANAGEMENT LP, LIME ROCK RESOURCES A, L.P., LIME ROCK RESOURCES B, L.P., LIME ROCK RESOURCES C, L.P., LIME ROCK RESOURCES II-A, L.P., LIME ROCK RESOURCES II-C, L.P., VANGUARD NATURAL RESOURCES, LLC, and LIGHTHOUSE MERGER SUB, LLC, | § § § § § § § § § § § § § § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT

1.     Plaintiff Ronald Krieger ("Plaintiff"), by his attorneys, brings the following class action on behalf of himself and all public unitholders of LRR Energy, L.P. ("LRR Energy") to enjoin the proposed acquisition of the publicly owned units of LRR Energy, its general partner, LRE GP, LLC ("LRE GP") and related entities (collectively "LRR Energy" or the "Company") by Vanguard Natural Resources, LLC ("Vanguard") through its wholly owned subsidiary Lighthouse Merger Sub, LLC ("Merger Sub," collectively referred to as "Vanguard"), as detailed herein (the "Proposed Transaction" or "Merger"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      LRR Energy is a limited partnership, organized and existing under the laws of the State of Delaware and maintains its principal executive offices in Houston, Texas.  LRR Energy was formed in April 2011 by Lime Rock Management LP ("LR Management") to operate, acquire, exploit, and develop producing oil and natural gas properties in North America.  LR Management also formed Lime Rock Resources ("LR Resources") for purposes of acquiring mature, low-risk producing oil and natural gas properties with long-lived production profiles.[1]  In connection with the completion of its IPO on November 16, 2011, LRR Energy acquired oil and natural gas properties and other contracts owned by LR Resources.  LR Resources, in turn, is LRR Energy's largest unitholder, owning 30.52% of the Company's outstanding units, and is also entitled to receive 100% of the distributions that LRR Energy makes through their Incentive Distribution Rights ("IDRs") through November 16, 2017.

3.      On April 20, 2015, Vanguard and LRR Energy announced that they had entered into a Purchase Agreement and Plan of Merger ("Merger Agreement") under which Vanguard will acquire all of the outstanding units of LRR Energy in a unit-for-unit transaction valued at approximately $251 million, with Vanguard assuming LRR Energy's net debt of $288 million. The vote on the Proposed Transaction is currently scheduled for September 10, 2015.

4.      Pursuant to the terms of the Merger Agreement, which was unanimously approved by the Company's Board of Directors ("Board" or "Individual Defendants"), LRR Energy unitholders will receive a fixed exchange ratio of 0.55 Vanguard units for each common unit of LRR Energy they own.  LRR Energy and Vanguard claim that this exchange ratio amounts to a deal consideration of $8.93 of per LRR Energy common unit, based on Vanguard's closing price of $16.23 on April 20, 2015 ("Merger Consideration").

---

[1] LR Management also controls LRE GP.

5.      As described below, both the value to LRR Energy unitholders contemplated in the Proposed Transaction and the process by which Defendants propose to consummate the Merger are fundamentally unfair to Plaintiff and all other public unitholders of the Company.

6.      Critically, there appears to be no protective collar on the exchange ratio and no guarantee that LRR Energy unitholders will receive the estimated $8.93 per unit consideration. In fact, Vanguard units are *currently* trading at $13.18 which amounts to grossly inadequate deal consideration of $7.24 per unit ($13.18 x 0.55 = $7.24).   Moreover, on January 20, 2015, Vanguard units traded at a 52-week low of $11.90 per unit, yielding a paltry deal consideration of only $6.55, substantially below LRR Energy's current trading price.

7.      Even assuming LRR Energy unitholders receive the $8.93 Merger Consideration, which Defendants have been touting, this price is wholly inadequate and falls substantially below the Company's 52-week high of $20.11.  Moreover, at least one analyst has set the target price of $10.00 for the Company, while other analysts have set the median price of the Company at $9.00; both above the consideration offered in the Merger.

8.      Additionally, the Merger Consideration is inadequate in light of LRR Energy's recent financial performance and potential for significant future growth.  In fact, LRR Energy's revenues, net income, adjusted EBITDA and distributable cash flows have been showing staggering growth over the last several quarters and year over year.   Commenting on the Company's success, LRR Energy's Co-CEO and Chairman, Defendant Eric D. Mullins ("Mullins"), stated he was encouraged about the Company's future growth prospects.  Indeed, the Board rejected Vanguard's 2013 offer to acquire the Company at an exchange rate of 0.58x, which is notably higher than the current Merger Consideration, stating that "the proposed exchange ratio and implied valuation did not adequately take into account [LRR Energy's] future

growth potential." However, the Board now entered into the Merger for even lower consideration causing LRR Energy unitholders to be denied the growth opportunities the Company has been touting.

9.      The Merger Consideration is particularly inadequate given the significant benefits Vanguard will reap if the Merger is consummated. Indeed, Vanguard boasted that it expects the transaction to be immediately accretive to its distributable cash flow per unit while lowering Vanguard's pro forma debt leverage.

10.     Compounding the failure to provide adequate consideration, the process that culminated in the Merger was fundamentally flawed because of disabling conflicts that infiltrated the sales process. The Individual Defendants failed to maximize value for the public unitholders of LRR Energy, while simultaneously guaranteeing for themselves significant benefits, through the acceleration and vesting of restricted units, consideration that will not be shared by the Class. The Proposed Transaction provides the added benefit of liquidity to certain Individual Defendants and other Defendants, as their illiquid holdings shed their restrictions as a result of the Merger Agreement. Therefore, Defendants were incentivized to drive a sales process that primarily served their own interests and was detrimental to LRR Energy unitholders.

11.     The Individual Defendants have further exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with preclusive deal protection devices that preclude other bidders from making successful competing offers for the Company. For example, pursuant to the Merger Agreement, the Board agreed to: (i) a "no-solicitation" provision prohibiting the Company from properly shopping itself; (ii) an "information rights" provision that requires the LRR Energy to notify the Vanguard within twenty-four (24) hours if the Company so much as receives an inquiry from an unsolicited bidder that may lead to a superior

proposal; (ii) a two (2) business-day "matching rights" period during which Vanguard can fully evaluate and match any superior proposal received by the Company; and (iii) a termination fee of **$7.288 million** plus expenses up an ***additional $1.215 million*** payable to Vanguard if the Company terminates the Merger Agreement to pursue another offer.   These provisions conjunctively and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives to the Proposed Transaction.

12.     Then on April 20, 2015, to ensure a *fait accompli*, Vanguard entered into a voting agreement with LR Resources, which guarantees that 30.52% of LRR Energy's units are voted in favor of the Merger.   The interests of LR Resources are not aligned with other LRR Energy unitholders because their holdings are so sizable that the Proposed Transaction is their only opportunity to obtain immediate liquidity.   Indeed, pursuant to the Merger Agreement, Vanguard has agreed to file a shelf registration statement with SEC, no later than 90 days after the close of the Merger, allowing LR Resources to cash out sell their units and obtain immediate liquidity.

13.     Additionally, an analysis of LRR Energy's and Vanguard's respective holders shows that aside from LRR Energy's largest unitholder, LR Resources, which had been effectively locked up by Vanguard, four out of five (4/5) of LRR Energy's next largest unitholders ***are also substantial holders of Vanguard***.   The interests of these unitholders are also not aligned with LRR Energy unitholders because, due to their substantial holdings in Vanguard, their interests are more aligned with Vanguard rather than LRR Energy.   As such, Defendants locked up the Proposed Transaction, for inadequate consideration, through a conflicted sales process, to the detriment of LRR Energy unitholders.

14.     Compounding the unfairness of the Proposed Transaction, Defendants issued materially incomplete and misleading disclosures in the Form S-4 Registration Statement (the

"S-4") filed with the United States Securities and Exchange Commission ("SEC") on June 3, 2015, and amended on July 9, 2015.[2]  The S-4 is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.

15.    Plaintiff seeks enjoinment of the Proposed Transaction or, alternatively, rescission of the Proposed Transaction in the event Defendants are able to consummate it.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) as Plaintiff asserts claims under the Securities and Exchange Act of 1934.

17.    The Court also has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because Plaintiff is a citizen of Pennsylvania while Defendants are all citizens of other states, and the amount in controversy exceeds $75,000.  Indeed, the value of the Proposed Transaction is approximately $539 million.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because LRR Energy maintains its primary place of business in this District.

## PARTIES

19.    Plaintiff is, and has been at all relevant times, the owner of LRR Energy units and has held such units since prior to the wrongs complained of herein.  Plaintiff is a citizen of Pennsylvania.

20.    Defendant LRR Energy is a limited partnership organized and existing under the laws of Delaware.  LRR Energy maintains its principal place of business at Heritage Plaza, 1111 Bagby Street, Suite 4600, Houston, Texas, 77002.  LRR Energy's common units trade on the New York Stock Exchange under the symbol "LRE."

---

[2] References to specific pages in the S-4 will refer to the amended S-4 dated July 9, 2015.

21.     Defendant LRE GP is a Delaware limited liability company and the general partner of LRR Energy.

22.     Defendant LR Management is a Delaware limited partnership which controls LRE GP.  LR Management formed LRR Energy in April 2011 to operate, acquire, exploit, and develop producing oil and natural gas properties in North America.  LR Management elects members of LRR Energy's Board of Directors.

23.     Lime Rock Resources A, L.P. ("LRR A") is a Delaware limited partnership.

24.     Lime Rock Resources B, L.P. ("LRR B") is a Delaware limited partnership.

25.     Lime Rock Resources C, L.P. ("LRR C") is a Delaware limited partnership.

26.     Defendants LRR A, LRR B and LRR C are collectively referred to as LR Resources.  LR Resources was formed by LR Management for purposes of acquiring mature, low-risk producing oil and natural gas properties with long-lived production profiles.  LR Resources is LRR Energy's largest unitholder, holding 30.52% of the Company's outstanding unit.  LR Resources is also entitled to collect 100% of the Company's IDRs until November 17, 2017.

27.     Lime Rock Resources II-A, L.P ("LRR II-A"), is a Delaware limited partnership and a party to the Merger Agreement.

28.     Lime Rock Resources II-C, L.P ("LRR II-C"), is a Delaware limited partnership and a party to the Merger Agreement.

29.     Defendants LRR II-A and LRR II-C are affiliated with LR Resources and but do not own LRR Energy units (collectively referred to as "Non-Fund LR Responses").

30.     Defendant Mullins has served as the Company's Co-CEO and Chairman of the Board since May 2011.  Mullins has also served as a Managing Director and Co-CEO of LR Resources, since April 2005 and October 2008, respectively.

31.     Defendant Charles W. Adcock ("Adcock") has served as the Company's Co-CEO and Directors of the Board since May 2011.  Adcock has also served as a Managing Director and Co-CEO of LR Resources, since May 2005 and October 2008, respectively.

32.     Jonathan P. Carroll ("Carroll") has served as a Director of the Company's Board since January 31, 2014.  Carroll also currently serves as a Member of the Conflicts and Audit Committees.

33.     Jonathan C. Farber ("Farber") has served as a Director of the Company's Board since May 2011.  Farber also serves as a Managing Director of Lime Rock Partners, a private equity firm he co-founded in 1998 to focus on investments of growth capital in energy companies worldwide.  Additionally, Farber currently serves as a Manager of LR Management and has voting and dispositive powers over the securities held by LR Resources.

34.     Townes G. Pressler, Jr. ("Pressler") has served as a Director of the Company's Board since May 2011.  Pressler has also served as a Managing Director of Lime Rock Partners since 2007.

35.     John A. Bailey ("Bailey") has served as an Independent Directors of the Company's Board since November 2011.  Bailey also currently serves as the Chairman of the Conflicts Committee and a Member of the Audit Committee.

36.     Defendants set forth in paragraphs 30 to 35 above are referred to herein as the "Board" or the "Individual Defendants."  Each of the Individual Defendants herein is sued individually and in his or her capacity as a director and/or officers of LRR Energy.  The liability

of each of the Individual Defendants arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

37.     Defendant Vanguard is a Delaware limited liability company that acquires and develops oil and natural gas properties in the United States. Vanguard common units are traded on NASDAQ GS under the symbol "VNR."

38.     Merger Sub is a Delaware limited liability company and a wholly owned subsidiary of Vanguard. Merger Sub was created for purposes of effectuating the Proposed Transaction.

39.     The Individual Defendants, LRR Energy, LRE GP, LR Management, LR Resources, the Non-Fund LR Responses, Vanguard and Merger Sub are collectively referred to as "Defendants."

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of LRR Energy common units who are being and will be harmed by Defendants' actions described below (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

41.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable. As of July 6, 2015, there were over 28 million outstanding LRR Energy common units. The holders of these units are believed to be geographically dispersed through the United States;

(b)     There are questions of law and fact which are common to the Class and which predominate over questions affecting individual Class members. The common questions include, *inter alia*, the following:

       i.     whether Defendants misrepresented or omitted material information concerning the Proposed Transaction in the S-4;

      ii.     whether the Individual Defendants were "controlling persons" over those that made the false and misleading statement in the S-4; and

      iii.     whether Plaintiff and other members of the Class would suffer irreparable harm if the misstatements and omissions in the S-4 are not corrected.

(c)     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

(d)     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

(e)     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

(f)     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.    LRR Energy' Background and Recent Financial Performance

42.     LRR Energy operates, acquires, exploits, and develops producing oil and natural gas properties in North America.  LRR Energy's properties are located in the Permian Basin region in West Texas and Southeast New Mexico, the Mid-Continent region in Oklahoma and East Texas, and the Gulf Coast region in Texas.

43.    On April 20, 2014, LRR Energy and Vanguard issued a joint press release announcing the Proposed Transaction which stated, in relevant part:

> **HOUSTON—(GLOBE NEWSWIRE)—April 20, 2015**— Vanguard Natural Resources, LLC (NASDAQ: VNR) ("Vanguard" or "the Company") and LRR Energy, L.P. (NYSE: LRE) today announced that they have entered into a Purchase Agreement and Plan of Merger pursuant to which a subsidiary of Vanguard will merge into LRR Energy, L.P. and, at the same time, Vanguard will acquire LRE GP, LLC, the general partner of LRR Energy, L.P. (collectively, "LRR Energy", or "LRE") for total consideration of $251 million in Vanguard common units and the assumption of LRE's net debt of $288 million.  As a result of the transaction, LRR Energy and its general partner will become wholly owned subsidiaries of Vanguard.  The transaction, which has been approved by the boards of directors of both companies, including the Conflicts Committee of the Board of Directors of LRR Energy, will be a tax-free unit-for-unit transaction with an exchange ratio of 0.55 Vanguard common units per LRE common unit. In addition, Vanguard will acquire all of the limited liability company interests in LRE GP, LLC in exchange for 12,320 Vanguard common units.  The consideration to be received by LRE unitholders is valued at $8.93 per LRR Energy common unit based on Vanguard's closing price as of April 20, 2015, representing a 13% premium to LRR Energy's closing price on April 20, 2015, and a 19% premium to LRR Energy's ten day volume weighted average price. Vanguard and LRR Energy expect the transaction to close in the third quarter of 2015.  The merger is subject to customary closing conditions, including the approval of the LRR Energy unitholders. Affiliates of Lime Rock Resources, LRE's largest unitholder (owning over 30 percent of its outstanding equity), have agreed to support and vote in favor of the transaction.
>
> \*   \*   \*
>
> Eric Mullins, Chairman and Co-Chief Executive Officer of LRR Energy commented, "We are pleased to announce our pending merger with Vanguard. We have great respect for Vanguard's management team, which has a strong track record of creating value for its unitholders." Charlie Adcock, Co-Chief Executive Officer of LRR Energy, noted, "We believe the transaction is compelling for LRR Energy unitholders for many reasons and that the strategic combination will deliver significant value in the future for our unitholders."
>
> **<u>Transaction Highlights</u>**
>
> - LRE's long-life, low-decline, mature assets are well-suited for Vanguard's upstream MLP model;
> - Proved R/P of approximately 14 years;
> - Balanced production and reserves product mix of 39% oil; 48% natural gas and 13% natural gas liquids;

- Assets add additional scale in Vanguard's existing Permian and Arkoma Basins;
- Properties more than 85% operated as measured by proved reserves;
- Significant potential for cost savings through G&A synergies;
- Strong commodity price hedge book with approximately 89% of natural gas and 80% of oil proved developed production hedged through 2018;
- Production of approximately 40 MMcfe/d, increasing Vanguard's current production by 10%;
- Proved reserves at December 31, 2014 (SEC pricing) of approximately 203 Bcfe, increasing Vanguard's estimated proved reserves by 10%;
- Approximately 1,290 gross producing wells and approximately 158,000 net acres; and
- The transaction is expected to be immediately accretive to distributable cash flow per unit.

**Transaction Benefits to LRE Unitholders**

- Unit price premium;
- Significantly larger and more geographically diverse asset base;
- Expected material operating and cost synergies;
- Stronger financial position and better access to capital markets;
- Enhanced distribution stability, coverage and growth potential;
- Ability to participate in the future growth and upside of the combined company; and
- Improved unit trading liquidity.

Upon the closing of the transaction, LRR Energy will be terminating the existing management services agreement with Lime Rock Management LP and Lime Rock Resources Operating Company, Inc.  Offset by incremental corporate hires, Vanguard expects to generate significant general and administrative expense savings.  Coupled with interest savings from the repayment of LRE's existing second lien term loan, which is required to be repaid upon a change of control, Vanguard expects that the transaction will be immediately accretive to distributable cash flow per unit while also lowering Vanguard's pro forma debt leverage.

Citigroup Global Markets Inc. acted as the exclusive financial advisor to Vanguard and Paul Hastings LLP acted as legal counsel to Vanguard. Tudor, Pickering, Holt & Co. acted as exclusive financial advisor to LRR Energy, and Andrews Kurth LLP and Richards, Layton & Finger, P.A. acted as legal counsel to LRR Energy.  Simmons & Company International provided a fairness opinion to the Conflicts Committee of LRR Energy's Board of Directors.  Latham & Watkins LLP acted as legal counsel to the Conflicts Committee of LRR Energy's Board of Directors.

**B.**     **The Proposed Transaction Undervalues LRR Energy Units**

44.     The consideration offered to LRR Energy unitholders in the Proposed Transaction is unfair and grossly inadequate because, among other things, the intrinsic value of LRR Energy common units is materially in excess of the amount offered.  The Proposed Transaction will deny Class members their right to share equitably in the true value of the Company.

45.     While the market has recently suffered a staggering decrease in oil and natural gas prices, LRR Energy's long-term prospects remain solid.  Indeed, the Company's recent financial performance has shown staggering growth and the substantial future prospects.

46.     On October 30, 2014, LRR Energy reported total revenues of $48.28 million for the third fiscal quarter of 2014, up 178% over the last quarter and 92% year over year.  The Company also reported adjusted EBITDA of $20.8 million and distributable cash flow of $13.1 million, up 6.16% and 10.85%, respectively, over the last quarter.  Commenting on LRR Energy's financial performance, Defendant Mullins stated that he was "pleased" with the Company's overall third quarter 2014 results.

47.     More recently, on March 3, 2015, LRR Energy reported total revenues of $96.1 million for the fourth fiscal quarter of 2014, up 98.6% over the last quarter and a staggering 212.6% year over year.  The Company also reported an 18.8% increase in Net Income over the last quarter and 4.89% increase in adjusted EBITDA over the last quarter, a 7% year over year. Additionally, the Company announced that its distributable cash flows were 13.7 million, up 4.6% over the last quarter and 6.6% year over year.

48.     On March 3, 2015, LRR Energy also announced its full 2014 fiscal year financial results, reporting total revenues of 187.9 million, up a staggering 63.3% from the previous year, adjusted EBITDA of 83.38 million, up 4.8% from the previous year and distributable cash flow of 52 million, up 4.9% from the previous year.

49.     Commenting on the Company's financial performance and growth prospects, Mullins stated:  "Overall, we are pleased with our results for the fourth quarter of 2014.  Our financial and operating results improved over the third quarter in part due to our Stroud acquisition that closed on October 1, 2014."

50.     However, rather than permitting the Company's units to trade freely and allowing its public unitholders to reap the benefits of the Company's increasingly positive long-term prospects, the Individual Defendants have acted for their personal benefit and the benefit of Vanguard and other Defendants and to the detriment of the Company's unitholders, by entering into the Proposed Transaction for inadequate consideration.  The Proposed Transaction places a cap on the Company's value at a time when LRR Energy is poised for tremendous growth. Indeed, at least one analyst has set the target price of $16.00 for the Company's units, while other analysts have set the mean price of the Company's units at $10.00; both above the consideration offered in the Merger.

51.     Indeed, the Board rejected Vanguard's 2013 offer to acquire the Company at an exchange rate of 0.58x, which is notably higher than the current Merger Consideration, stating that "the proposed exchange ratio and implied valuation did not adequately take into account [LRR Energy's] future growth potential."  However, the Board now entered into the Merger for even lower consideration causing LRR Energy unitholders to be denied the growth opportunities the Company has been touting.

52.     While Defendants claim that the 0.55 exchange ratio amounts to a deal consideration of $8.93 per unit, such a claim is illusory.  In fact, the $8.93 Merger Consideration is only based on Vanguard's closing price on April 20, 2015.  There is no protective collar on this ratio and, therefore, there is no guarantee that LRR Energy unitholders will receive such

consideration.  In fact, Vanguard units are ***currently*** trading at $13.18 which amounts to grossly inadequate deal consideration of $7.24 per unit ($13.18 x 0.55 = $7.24).  Moreover, on January 20, 2015, Vanguard units traded at a 52-week low of $11.90 per unit, yielding a paltry deal consideration of only $6.55, substantially below LRR Energy's current trading price.

53.     Moreover, while Defendants allege that the deal contains a "premium," such allegations are also misleading.  As discussed above, the 0.55 exchange ratio is very likely to yield a consideration price that is well below the Company's 52-week high of $20.11.  Even when considering the estimated consideration of $8.93, based on Vanguard's closing unit price on April 20, 2015, compared to the Company's current trading price of $8.75, the Proposed Transaction amounts to a negligible premium at best, and inadequately compensates LRR Energy unitholders for relinquishing their control of the Company.

54.     The Merger Consideration is particularly inadequate given the substantial benefits Vanguard will reap if the Merger is consummated.  Indeed, Vanguard boasted that it expects the transaction to be immediately accretive to its distributable cash flow per unit while lowering Vanguard's pro forma debt leverage.  Vanguard also touted that the Merger will boost its production and reserves by 10% while allowing Vanguard to benefit from significant cost savings and substantial synergies.  Recognizing the tremendous benefit of acquiring LRR Energy, Vanguard's President and CEO Scott W. Smith, stated:

> The transaction we announced today is a great opportunity for the Company and our unitholders. The assets being acquired are attractive bolt-ons to our Permian and Arkoma basin operations and have an inventory of development projects that generate good returns even in the current commodity environment. We believe this transaction should have a positive impact on all aspects of our business.

55.     Despite such substantial synergies and LRR Energy's growth prospects, Defendants have agreed on Merger Consideration that is wholly inadequate and fails to reflect the intrinsic value of the Company.

**C.      Conflicted Sales Process**

56.     In addition to the inadequate consideration offered to LRR Energy unitholders, the entire process deployed by Defendants was also unfair and inadequate because of disabling conflicts of interest.

57.     While LRR Energy public unitholders will be fleeced of their holdings in the Company, certain Defendants stand to receive a financial windfall they would not otherwise enjoy if the Company were to remain a standalone entity.  Pursuant to the Merger Agreement, the Company's restricted units will no longer be subject to their restrictions and will become fully redeemable upon consummation of the Proposed Transaction.  Each of the Individual Defendants has substantial holdings in the Company in the form of restricted units.  The Proposed Transaction will certainly provide the substantial benefit of allowing the Individual Defendants and LR Resources (which owns 30.52% of outstanding units) to liquidate their otherwise illiquid holdings – a benefit not available to the Class.  As such, Defendants were incentivized to drive a sales process that primarily served their own interests and was detrimental to LRR Energy unitholders.  Such material benefits received by the Individual Defendants and other Defendants, and not shared by other LRR Energy unitholders, cast substantial doubt on the Board's ability to exercise independent business judgment on the fairness of the consideration obtained in the Merger.

58.     To lock up the Proposed Transaction and ensure a *fait accompli*, on April 20, 2015, Vanguard entered into a voting agreement with LR Resources, which guarantees that 30.52% of LRR Energy's units are voted in favor of the Merger.  It should be noted that the

securities held by LR Resources were entirely controlled by Defendant Farber, a member of the Company's Board and the Manager of LR Management. As previously described, the interests of LR Resources are not aligned with other LRR Energy unitholders because their holdings are so sizable that the Proposed Transaction is their only opportunity to obtain immediate liquidity. Indeed, pursuant to the Merger Agreement, Vanguard has agreed to file a shelf registration statement with SEC, no later than 90 days after the close of the Merger, allowing LR Resources to cash out sell their units and obtain immediate liquidity. Moreover, following the consummation of the Merger, LR Resources' ownership in the post-merger entity would fall below 5%, meaning they could immediately sell their units without the scrutiny of the public markets.

59.    Additionally, an analysis of LRR Energy's and Vanguard's respective holders shows that aside from LRR Energy's largest unitholder, LR Resources, which had been effectively locked up by Vanguard, four out of five (4/5) of LRR Energy's next largest unitholders are also substantial holders of Vanguard. For example, LRR Energy's second largest unitholder, Cushing MLP Asset Management LP, which holds 3.76% of LRR Energy outstanding units, is also the single largest Vanguard unitholders. Deutshe Bank AG, Index Management Solutions LLC and Wells Fargo & Company, the next largest LRR Energy unitholders are also substantial unitholders of Vanguard. The interests of these unitholders are also not aligned with other LRR Energy unitholders. Because of their substantial holdings in Vanguard, it is likely in their best interests for Vanguard to obtain financial benefits from the Merger at the expense of LRR Energy unitholders.

D.    **The Preclusive Deal Protection Devices**

60.    In addition to failing to engage in a fair and reasonable sales process, the Individual Defendants, driven by their own personal interests, agreed to certain deal protection

devices that operate conjunctively to deter other suitors from submitting a superior offer for the Company.

61.     For example, § 7.3 of the Merger Agreement, contains a "no solicitation" provision which bars the Board and any Company representatives from attempting to procure a price in excess of the amount offered by Vanguard.  It further demands that the Company terminate any and all prior or on-going discussions with other potential suitors.

62.     Pursuant to § 7.3 (b) of the Merger Agreement, if the Company so much as receives an inquiry from an unsolicited bidder that may lead to a superior proposal, it must notify Vanguard within twenty four (24) hours of the identity of the bidder and the material terms of the proposal, prior to taking action pursuant to the competing proposal.

63.     Further, pursuant to § 7.3 (d) of the Merger Agreement, the Board must also give Vanguard two (2) business days after the delivery of the prompt notice during which it must negotiate with Vanguard (should Vanguard desire to negotiate) so that Vanguard has the opportunity to adjust the terms and conditions of the Merger Agreement so that the competing proposal ceases to be a superior proposal.  Accordingly, the Merger Agreement unfairly assures that any "auction" will favor Vanguard and piggy-back upon the due diligence of the foreclosed alternative bidder.

64.     In addition, § 9.4 of the Merger Agreement provides that LRR Energy must pay to Vanguard a termination fee of *$7,288,000* plus expenses up an *additional $1,215,000*, if the Company decides to pursue another offer, thereby essentially requiring that any alternate bidder agree to pay a naked premium for the right to provide the unitholders with a superior offer.

65.     Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all

or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

### F.      The Materially Misleading and Incomplete S-4

66.      On June 3, 2015, Defendants filed the S-4, which was amended on July 9, 2015. The S-4 fails to disclose material information necessary to make the statements therein not misleading and also necessary for a reasonable unitholder to make an informed vote regarding the Merger.

### i.      Material Omissions and Misrepresentations Concerning the Background of the Proposed Transaction

67.      The S-4 omits many important details concerning the process that led up to the signing of the Merger Agreement.

68.      Specifically, the S-4 fails to disclose the nature and extent of any prior relationship between LRR Energy and Vanguard, and/or any of their respective directors or officer.  This information is material to unitholders because it explains why the Board favored Vanguard to the exclusion of other bidders.

69.      Additionally, the S-4 states that in 2013 Vanguard submitted an offer to acquire the Company at an exchange ratio of 0.58x, which is notably higher than the current Merger Consideration offered by Vanguard, but LRR Energy rejected the offer as inadequate because it did not account for LRR Energy's future growth potential.  However, the S-4 fails to disclose what the Board considered the Company's value to be at that time and any efforts made to convey this value to Vanguard in order to compel Vanguard to raise their offer.  This information

is material to unitholders because it shows how the Board quantified the Company's future growth potential and evinces the Board's measure of the Company's intrinsic value.

70.     The S-4, on page 67, makes references to a Conflicts Committee that existed in 2012 and 2013; however, the S-4 fails to disclose any information regarding: (i) the members of the Committee, including how and when they are appointed; (ii) the Committee's duties, powers and restrictions, including its specific role in regards to the Proposed Transaction; and (iii) why the Committee had virtually no involvement in the outreach or negotiations that took place with potential acquirers.   This information is material to unitholders because it demonstrates the inefficiency of the Conflicts Committee and evinces a lack of good faith in their willingness to allow wholly interested parties to control the entire sales process and negotiate for their own personal benefits and to the detriment of LRR Energy unitholders.

71.     The S-4 fails to disclose the vetting process that led to the selection of Tudor, Pickering, Holt & Co. Advisors, LLC ("TPH") as the Company's financial advisor, and Simmons & Company International ("Simmons") the Conflict Committee's financial advisor, as well as whether any other banks were considered.   This information is material to unitholders so they can understand the rationale for the selection of the two banks and whether a conflicts check was performed to ensure that the banks were capable of rendering independent advice to the Board and the Conflicts Committee.

72.     The S-4 states on page 70, that the Conflicts Committee engaged Simmons on April 15, 2015, *5 days* before entering into the Merger Agreement.  Additionally, the S-4 states that on April 17, 2015, the Committee had a telephonic meeting with Simmons in which the bank provided an overview of the process *to be undertaken* by Simmons to evaluate the fairness of the Proposed Transaction.  As such, it appears that Simmons only had *3 days* to conduct its financial

analysis before LRR Energy entered into the Merger Agreement on April 20, 2015.  Thus, the S-4 fails to disclose why the Committee gave Simmons such limited time to conducts its valuation and financial analyses and whether the Committee and the Board had concerns that this limited time was not sufficient to allow Simmons to perform an adequate analysis.  This information is entirely critical to unitholders because Simmons' fairness opinion was touted to unitholders as a reason for why they should vote in favor of the Merger; therefore, unitholders need to be made aware of any issues that affect its accuracy or reliability.

73.    The S-4 fails to disclose whether any of the confidentiality agreements entered into by the various parties during the sales process contained "don't-ask-don't-waive" standstill provisions.  This information is material to unitholders because it allows them to determine whether there are other potentially interested bidders who are contractually precluded from making superior offers to acquire the Company.

74.    The S-4 states that on April 13, 2015, Defendants Adcock and Mullins met **privately** with Vanguard's management to discuss due diligence investigations and negotiations.  However, the S-4 fails to disclose: (i) why such meetings had to be private; (ii) why the Conflicts Committee or the rest of the Board could not be involved in such meetings; and (iii) whether continued employment or other benefits to LRR Energy's management were discussed at this meeting.  This information is material to unitholders because the entire sales process was controlled and Defendants Adcock and Mullins; therefore, it is critical to know what interests these Defendants had that were different from the rest of the Board or the Company's unitholders.

75.    Moreover, the S-4 states that the Company's **management** was negotiating with Company A from January 2015 up to April 19, 2015, one day before entering into the Merger

Agreement.  Moreover, the S-4 states, on page 71, that LRR Energy's management believed that the various proposals submitted by Company A were not "compelling."  However, the S-4 fails to disclose *any* of the proposals or offer terms that were submitted by Company A.  This information is material to unitholders because Company A's offer could have potentially been higher that the Merger Consideration offered by Vanguard.  Moreover, management's assessment of what is "compelling" is misleading without disclosure of the actual offers because management is entirely conflicted and interested in the sales process.

76.     The S-4 states, that on April 17, 2015, LRR Energy's management told the Board that it only considered upstream MPLs as potential merger parties; and further stated that Vanguard "and one other upstream MLP" where potential good fits.  In this regard, the S-4 fails to disclose: (i) why management discounted a transaction with Company A, which is not an upstream MLP, even though they had originally targeted non-upstream MLP parties as potential acquirers; and (ii) who the other upstream MLP was that management referenced as a potentially good fit.  Indeed, the S-4 fails to provide any information about another upstream MLP party involved in the sales process.  This information is material to unitholders because it shows why management did not want a transaction with Company A and also evinces the existence of other interested bidders who could have potentially submitted offers in excess of the Merger Consideration offered by Vanguard.

77.     Each of the above referenced omissions are material and must be disclosed to make the statements in the S-4 not fails or misleading.

**ii.      Materially Incomplete and Misleading Disclosures Concerning TPH's and Simmons' Financial Analyses**

78.      In addition to the above, the S-4 also omits several important details concerning the financial analysis undertaken by both TPH and Simmons in support of their fairness opinions.

a)  Management Projections:

79.      Specifically, while the S-4 discloses some of the management prepared financial projections which both THP and Simmons relied upon in their financial analyses, the S-4 fails to disclose the material free cash flow figures which both bank specifically referenced as critical figured they relied upon in their respective Analyses.  It is well-settled that such cash flow figures are crucial to providing unitholders with management's inside view of the Company's value and future prospects.  This data is necessary when asking unitholders to make an informed decision about whether to vote in favor of the Proposed Transaction and, thus, must be disclosed.

80.      Additionally, the S-4 specifically states, on page 90, that management projected certain cost savings synergies, which management labeled "LRE Synergies" and further provided such projections to TPH for their financial analyses.  However, the S-4 fails to disclose these LRE Synergies.  Moreover, the S-4 fails to disclose why such projections were only provided to TPH and not Simmons.  This information is material to unitholders because it directly relates to management's valuation of the Company and the Proposed Transaction and further allows unitholders gauge the accuracy and reliability of Simmons' financial analyses.

b)  TPH's Financial Analyses:

81.      With respect to TPH's *Net Asset Value Analysis*, referenced on page 92, the S-4 fails to disclose: (i) the definition of "pre-tax future cash flows" used in the analysis; (ii) the key inputs considered by TPH in selecting the discount rate range of 8-10%; and (iii) the projected

free cash flows used in the analysis.  This information is material and necessary because absent disclosure of the information, unitholders have no way to gauge the weight of the TPH's valuation range.

82.     Likewise, with respect to TPH's *Discounted Cash Flow Analysis*, referenced on pages 92 to 93, the S-4 fails to disclose: (i) the key inputs considered by TPH in selecting the discount rate range of 8-10%; (ii) the judgments made by TPH in applying the multiple range of 5x to 8x 2019 estimated EBITDA to calculate terminal values for LRR Energy, as well as what such terminated values were; and (iii) the judgments made by TPH in applying the multiple range of 6x to 9x 2019 estimated EBITDA to calculate terminal values for Vanguard, as well as what such terminated values were.  This information is material and necessary to unitholders so they can understand the various assumptions underlying TPH's analyses and determine what weight to give them.

83.     With respect to TPH's *Relative Contribution Analysis*, referenced on page 93, the S-4 fails to disclose the separate values and metrics for Vanguard and LRR Energy that were analyzed and which led TPH to conclude its implied range of exchange ratios of 0.173x to 1.178x.  This information is material because it provides the basis of TPH's analysis rather than just stating an unsupported conclusion.  Moreover, this information is material because the implied exchange ratio range calculated by TPH is drastically different that the range determined by Simmons.

84.     With respect to TPH's *Selected Companies Analysis* (page 93), as well as its *Selected Transaction Analysis* (page 94), the S-4 fails to disclose: (i) the criteria for selecting the companies and transactions used in the analyses; (ii) the multiples and metrics observed for each of the companies and transactions in the analysis; and (iii) the range of implied exchange ratios

and/or implied equity values derived from the analyses.  This information is material and necessary for LRR Energy unitholders to have a fair summary of the financial analysis performed by TPH.

c)  Simmons' Financial Analyses:

85.     With respect to Simmons' *Commodity Price Assumptions*, referenced on pages 104-105, the S-4 fails to disclose why some of these pricing assumptions are different than those used by TPH, even though both banks purportedly referenced the same indexes for the same time periods.  This information is material because the pricing assumptions underlie the financial analyses of both banks; therefore, absent an explanation of why the pricing assumptions are different the S-4 is misleading.

86.     With respect to Simmons' *Premiums Paid Analysis*, referenced on pages 105-106, the S-4 fails to disclose: (i) rationale for selecting the time periods used in the analysis; (ii) whether the premiums to the 30 and 60-day averages took trading volumes into account; and (iii) the premium to the volume-weighted average closing price of the Company's units for the one-year period ended on April 17, 2015.  This information is material because it provides unitholders with a fair summary of Simmons' analysis.

87.     With respect to Simmons' *Contribution Analysis*, referenced on pages 106-107, the S-4 fails to disclose the free cash flow figures used in the analysis.  This information is material because the implied exchange ratio range calculated by Simmons is drastically different that the range determined by TPH.

88.     With respect to Simmons' *Proved Net Asset Value Analysis*, referenced on page 108, the S-4 fails to disclose: (i) the definition of "free cash flows" used in the analysis; and (ii) the key inputs considered by Simmons in selecting the discount rate range of 8-10%.  This

information is material and necessary because absent disclosure of the information, unitholders have no way to gauge the weight of the Simmons' valuation range.

89.     With respect to Simmons' *Comparable Company Analysis*, referenced on pages 108-109, the S-4 fails to disclose: (i) the criteria for selecting the comparable companies used in the analysis; and (ii) the multiples observed for each company in the analysis. This information is material and necessary for LRR Energy unitholders to have a fair summary of the financial analysis performed by Simmons.

90.     With respect to Simmons' *Comparable Transactions Analysis*, referenced on pages 109-110, the S-4 fails to disclose: (i) the criteria for selecting the transactions used in the analysis; (ii) the multiples observed for each of the transactions in the analysis; and (iii) whether Simmons considered any other metrics besides Enterprise Value to 2015 and 2016 EBITDA. This information is material and necessary to unitholders so they can understand the various assumptions underlying Simmons' analysis and determine what weight to give them.

91.     Absent the material information set forth above, the S-4 is misleading and LRR Energy unitholders do not have sufficient information to make a fully-informed vote for or against the Merger. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company unitholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class for Violations of Sections 14(a) of the Exchange Act Against LRR Energy, Vanguard and the Individual Defendants**

92.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

93.     Defendants have issued the S-4 with the intention of soliciting unitholder support for the Merger.

94.     Section 14(a) of the Exchange Act makes it unlawful to solicit a proxy "in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest."  15 U.S.C. § 78n(a).

95.     Rule 14a-9, which the SEC promulgated under § 14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."  17 C.F.R. § 240.14a-9(a).

96.     Specifically, as detailed in ¶¶ 66-91 above, the S-4 violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) material information regarding the process leading up to the signing of the Merger Agreement; (ii) critical projected financial information prepared by LRR Energy management and relied upon by both TPH and Simmons in their financial analyses supporting their fairness opinions; (iii) key inputs and assumptions underlying TPH's financial analyses; and (iv) key inputs and assumptions underlying Simmons' financial analyses.  Disclosure of such omitted information is necessary to make the statements made in the S-4 not misleading.

97.     In the exercise of reasonable care, Defendants knew or should have known that the S-4 was materially false and/or misleading and would be relied upon by LRR Energy unitholders in determining how to vote their units in connection with the Proposed Transaction.

98.     If Plaintiff and the other members of the Class were in possession of the facts that have been concealed and omitted by Defendants, Plaintiff and other members of the Class would be materially less likely to vote their units in favor of the Proposed Transaction.

99.     Moreover, the misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their entitlement to cast fully informed votes if such misrepresentations and omissions are not corrected prior to the vote on the Merger.  As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT II

**On Behalf of Plaintiff and the Class for Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

100.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above as though fully set forth herein.

101.     The Individual Defendants acted as controlling persons of LRR Energy within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of LRR Energy, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

102.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and the statements alleged by Plaintiff to be false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The S-4 contains the unanimous recommendation of each of the Individual Defendants to approve the Merger.  Thus, the Individual Defendants were intimately connected with, and directly involved in, the making of the document.

104.    In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

105.    By virtue of the foregoing, the Individual Defendants violated § 20(a) of the Exchange Act.

106.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class were injured thereby.

107.    Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against Defendants, jointly and severally, as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Declaring that the S-4 violates Federal Laws;

C.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information, detailed above, which is necessary to make the S-4 not false and misleading;

D.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

E.      Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: July 14, 2015.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____

Thomas E. Bilek
TX Bar 02313525 / SDTX Bar 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720

*Attorneys for Plaintiff*


**OF COUNSEL:**

Juan E. Monteverde
Innessa S. Melamed
**FARUQI & FARUQI, LLP**
369 Lexington Ave., Tenth Floor
New York, NY  10017
Tel:  212-983-9330
Fax:  212-983-9331
Email: jmonteverde@faruqilaw.com
        imelamed@faruqilaw.com